# EXHIBIT 1

CONSULTING AGREEMENT
COLLIER ENTERPRISES MANAGEMENT, INC.

This Agreement (this "**Agreement**") is made and entered into as of this _14_ day of February, 2020 (the "**Effective Date**"), by and between Collier Enterprises Management, Inc., a Florida for-profit corporation (the "**Company**"), and SEBMEDIA, INC., a _CALIFORNIA_ corporation (the "**Consultant**").

**RECITALS:**

WHEREAS, Consultant has certain expertise in matters relating to the Company's business activities;

WHEREAS, the Company wishes to retain Consultant to render certain services on the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the above and the mutual covenants and promises contained herein and other valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties agree as follows:

**AGREEMENT**

1.  **Consulting Services.** The parties agree that Consultant will render services to the Company immediately following the Effective Date, as follows:

    a.  **Term of Consulting Agreement.** The term of this Agreement will commence on the Effective Date and will terminate in accordance with the Statement of Work (as defined below) (the "**Term**").

    b.  **Services.** During the Term of this Agreement, Consultant will provide consulting services to the Company as described in that certain Statement of Work attached hereto as Exhibit A (the "**Statement of Work**") regarding the Company's business, and perform such other projects or tasks as may be agreed to from time to time by the Company and Consultant (the "**Services**").

    c.  **Consulting Fees.** Consultant will be compensated as provided on the attached Exhibit B. Consultant will be reimbursed for travel and other expenses that have been approved in advance in writing and that are incurred on behalf of the Company in connection with Consultant's provision of consulting services to the Company.

    d.  **Independent Contractor Status.** It is the express intention of the parties to this Agreement that during the Term of this Agreement, Consultant will be an independent contractor, and will be classified by the Company as such for all purposes and will not be, or represent itself or any of its affiliates as, an officer, director, employee, agent, joint venturer, or partner of the Company, and

Consultant and its affiliates will not be entitled to, and hereby waive any right to receive, any benefits that would be available if Consultant or any of its affiliates were deemed an employee of the Company, including, but not limited to, health, dental or vision insurance coverage, or participation in the Company's 401(k) plan. Nothing in this Agreement will be interpreted or construed as creating or establishing an employment relationship between the Company and Consultant or any of its affiliates at any time. Consultant and its affiliates agree to properly report and pay taxes on all fees received from the Company.

2. **Representations and Covenants.** Consultant represents to and covenants with the Company as follows:

   a. When acting on the Company's behalf, it will perform its services promptly and in a professional and workmanlike manner to the best of its abilities;

   b. When acting on the Company's behalf, it will place the Company's interests ahead of the interests of all others, and that if it perceives a conflict of interest, or the appearance of a conflict of interest, it will immediately notify the Company upon learning of such potential conflict, so that it and the Company may discuss and agree upon how to address the matter (*e.g.*, recusal from specific matter).

   c. The performance of all of the terms of this Agreement will not breach any other agreement to which Consultant or its affiliates are a party.

3. **Termination of Relationship.** Notwithstanding anything in this Agreement to the contrary, Consultant's relationship with the Company may be terminated at any time by the Company or Consultant upon written notice to the other party.

4. **Confidential and Proprietary Information.**

   a. Consultant and its affiliates agree at all times during the Term of this Agreement and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm, corporation or entity without written authorization of the Company, any Confidential and Proprietary Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. Consultant and its affiliates understand that for the purposes of this Agreement "**Confidential and Proprietary Information**" means any information, technical data, trade secrets or know-how of the Company or any of its related entities or affiliates or any of their customers, vendors, business partners or investors, including, but not limited to, research, product plans or other information regarding products or services and markets therefor; customer lists and customers including, but not limited to, customers on whom Consultant called or with whom Consultant became acquainted during the Term of Consultant's services with the Company pursuant to this Agreement or otherwise; marketing; finances or other business information that is provided to Consultant, either directly or indirectly, whether in writing, orally or by

observation, including, but not limited to, research, products, services, product plans, clients, client lists, lead lists, markets, marketing, expansion plans, databases, software, developments, inventions, processes, technology, designs, drawings, engineering, hardware configuration information, finances, financial results or other business information. Confidential and Proprietary Information does not include information, technical data, trade secrets or know-how that: (i) is in the possession of, or becomes available to, Consultant on a non-confidential basis, as shown by Consultant's files and records, and such information was received from a source not known by Consultant to be bound by any obligation not to disclose the information; (ii) prior to or after the time of disclosure, becomes part of the public knowledge or literature, not as a result of any inaction or action of Consultant; or (iii) is approved for release by the Company in writing. In any dispute involving Confidential and Proprietary Information, Consultant shall have the burden of proving any of the above exceptions.

b.  Consultant and its affiliates agree that all Confidential and Proprietary Information will be the sole property of the Company and its assigns. Consultant and its affiliates hereby assign to the Company any rights Consultant and its affiliates may have or may acquire in and to such Confidential and Proprietary Information. At all times, both during Consultant's services as Consultant to the Company and after its termination, Consultant and its affiliates will keep in confidence and trust all Confidential and Proprietary Information, and will not use or disclose any Confidential and Proprietary Information or anything relating to it without the written consent of the Company except as may be necessary in the ordinary course of performing duties to the Company.

c.  Consultant and its affiliates agree that all documents or other media records, apparatus, equipment and other physical property, whether or not pertaining to Confidential and Proprietary Information, furnished to Consultant or its affiliates by the Company or produced by Consultant or others in connection with Consultant's services to the Company at any time (including, without limitation, prior to the Effective Date) will be and remain the sole property of the Company. Consultant will return and deliver all such property of the Company immediately as and when requested by the Company. Consultant will return and deliver all such property (including any copies thereof) upon request, and even without any request, upon the Termination Date. Consultant will destroy all digital files in Consultant's possession that are Confidential and Proprietary Information upon request, and even without any request, upon the Termination Date.

d.  Consultant agrees to assist the Company by executing any documents that the Company may reasonably request for use in obtaining or enforcing its legal rights under this Agreement. Consultant's obligations under this paragraph will continue beyond the termination of its engagement with the Company, provided that the Company will compensate Consultant for time or expenses incurred by it at the Company's request on such assistance. Consultant appoints any authorized officer

3

of the Company as its attorney-in-fact to execute documents on Consultant's behalf for this purpose.

5. **Ownership.**

    a. The intent of the parties is that the Company will own all rights, including all intellectual property rights, to all deliverables and any other documentation, materials or intellectual property hereunder (collectively, the "**Materials**"). To that end, Consultant hereby acknowledges that, except as otherwise noted, the Materials are works which have been specially commissioned by the Company and are "work made for hire" for the Company, and the Company will own all right, title, and interest therein. The Company will be considered the author of the Materials for purposes of copyright and will own all the rights in and to the copyright of the Materials and, as between the Company and Consultant, only the Company will have the right to obtain a copyright registration on the same which the Company may do in its name, its trade name or the name of its nominee(s). Accordingly, among other things, the Company is the author and owner of the Materials and will have the sole and exclusive rights to do and authorize any and all of the acts set forth in Section 106 of the Copyright Act with respect to the Materials and any derivatives thereof, and to secure any and all renewals and extensions of such copyrights. To the extent Consultant does not own such Materials as a work made for hire, or to the extent that the Materials do not qualify for any reason as copyrightable works or as works made for hire, Consultant hereby assigns, transfers, releases, and conveys to the Company all rights, title, and interest to such Materials, including but not limited to all other patent rights, copyrights, and trade secret rights. Consultant waives the benefit under any law or principle knows as "droit moral" or "moral rights" or any similar law or principle.

    b. The Company hereby acknowledges that Consultant will retain ownership of any and all materials and software used to create the Materials, both in object code and source code form, to the extent that Consultant has developed such materials or software before the Effective Date of this Agreement or that Consultant independently develops or licenses from a third party, and that are not included in any of the Materials (collectively, the "**Underlying Technology**"). Notwithstanding the foregoing, the Company will have the continuing non-exclusive right to utilize the Underlying Technology as contained in the Materials in order to use, exploit, distribute, advertise, and otherwise reproduce and distribute and produce derivatives of any and all of the Materials, in any manner and in any and all media as the Company may determine, perpetually and throughout the universe in any and all media whether now known or hereafter devised.

    c. At the Company's request, Consultant will execute, verify, acknowledge and deliver to the Company or its designee any assignments or other instruments that the Company may deem reasonably necessary or desirable to evidence, establish, maintain, protect, enforce or defend the Company's right and title to the Materials.

    d.    In the event that Consultant should retain the services of employees, agents or other third parties for the creation of any aspect of the Materials, Consultant warrants that it has obtained sufficient rights from such parties sufficient to ensure that the Company will hold all rights as anticipated by this Section 5.

    e.    Consultant represents that its performance of all the terms of this Agreement will not breach any intellectual property assignment, proprietary information, confidentiality or similar agreement or other rights of any other party. Consultant further represents and warrants that no third party holds any intellectual property rights with respect to the Materials, other than as explicitly disclosed in this Agreement, and the Materials and the use of the Materials by the Company will not infringe any rights of any third parties.

6. **Non-Solicitation.** During the Term and for a period of one (1) year thereafter, neither the Company nor Consultant will directly or indirectly (a) solicit employees or consultants of the other party to leave their employment or engagement; (b) solicit suppliers or customers of the other party if the identity of the supplier or customer or information about the supplier or customer relationship is a trade secret or is otherwise deemed Confidential and Proprietary Information; or (c) request or advise any suppliers or customers of the other party to withdraw, curtail or cancel any business they have with the other party.

7. **Entire Agreement.** This Agreement, together with any separate documents or agreements referenced herein, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes and completely and irrevocably terminates any and all other previous or contemporaneous communications, representations, understandings, agreements, negotiations and discussions, either oral or written, between the parties with respect to the subject matter hereof. The parties acknowledge and agree that there are no written or oral agreements, understandings, or representations directly or indirectly related to this Agreement or the Services, compensation or benefits of Consultant that are not set forth herein. In the event of a conflict between a provision in this Agreement and a provisions in any separate document or agreement referenced herein, the provision of this Agreement will prevail.

8. **Amendment of Agreement.** This Agreement may be altered or amended in any of its provisions only by the mutual written agreement of the parties hereto.

9. **Successors.** The Company may assign this Agreement to its related parties, and this Agreement also will apply to and inure to the benefit of the successors and assigns of the Company. Consultant's services are personal in nature and this Agreement may not be assigned by it without the Company's prior written consent, which consent may be withheld in the sole discretion of the Company.

10. **Injunctive Relief.** Consultant understands that in the event of a breach or threatened breach of this Agreement by Consultant, the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement.

11. **Applicable Law; Dispute Resolution.** This Agreement will be deemed to have been executed and delivered within the State of Florida, and the rights and obligations of the parties hereunder will be construed and enforced in accordance with, and governed by, the laws of the State of Florida without regard to principles of conflict of laws. The Company and Consultant and its affiliates agree that all disputes among them that they cannot resolve informally will be subject to prompt, binding, and confidential arbitration pursuant to the rules of the American Arbitration Association or JAMS/Endispute, as the party petitioning for arbitration may elect to use, in Naples, Florida. This agreement to arbitrate will be read broadly, and will cover all disputes among the parties arising out of or in connection with the transactions, actions or omissions arising out of or in connection with this Agreement. The Company and Consultant and its affiliates hereby submit to the jurisdiction of the state courts located in Collier County, Florida or the federal district court located in Fort Myers, Florida.

12. **Notice.** Any notice to be given hereunder must be delivered personally or by fax, or by deposit in the United States mail, postage prepaid, certified or registered, and addressed to the party receiving notice at the address set forth below their respective signatures. Notice will be deemed given on delivery or seventy-two (72) hours after mailing as provided herein. Notice may also be given via email and will be valid only when the receiving party replies with an email confirming receipt.

13. **No Waiver.** The waiver of any breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach. Each and every right, remedy, and power hereby granted to any party or allowed it by law will be cumulative and not exclusive of any other.

14. **Construction.** Each Party has cooperated in the drafting and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same will not be construed against any party on the basis that the party was the drafter.

15. **Counterparts.** This Agreement may be executed in counterparts, and each counterpart will have the same force and effect as an original and will constitute an effective, binding agreement on the part of each of the undersigned. Either party may execute this Agreement by signing on the designated signature block below, and by transmitting such signature page via facsimile or e-mail (via PDF format) to the other party. Any signature made and transmitted by facsimile or e-mail (via PDF format) for the purpose of executing this Agreement will be deemed an original signature for purposes of this Agreement, and will be binding upon the party transmitting its, his or her signature by facsimile or e-mail (via PDF format).

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

| | |
|---|---|
| **SEBMEDIA, INC.** | **COLLIER ENTERPRISES MANAGEMENT, INC.** |
| By: *[signature]* | By: *[signature]* |
| Name: Sonja Eddings Brown | Name: Christian Spilker |
| Title: PRESIDENT | Title: Senior Vice President |
| Address: 1437 E. South Temple, Salt Lake City, UTAH 84102 | Address: 2550 Goodlette Road North, Suite 100, Naples, FL 34103 |

**Exhibit A**

**Statement of Work**
As referenced in Section 1(b) of this
Agreement

1. Responsibilities:
    - Create two appropriate and effective political action committees ("**PAC**" or "**PACs**") to increase effectiveness of Collier giving and to provide separation for the business and family, if requested;
    - Coordinate with the Company's executive management to facilitate the sale of the Collier Everglades lands owned by the Company or its related entities to the State of Florida or another governmental unit;
    - Review and augment the Company's relationships with decision-makers within the Florida state government and federal government to position the Company, its related entities, and the Collier family to support future real-estate initiatives;
    - Review and augment the political and public-relations strategy for the Company and its related entities to facilitate deal-making efforts; and
    - Obtain federal and state funding for preservation/disposition of real estate in the Everglades owned by the Company and its related entities.

2. Tasks:
    - Retain the law firm of Holtzman Vogel Josefiak Torchinsky PLLC to assist in creation of the PACs and associated compliance efforts;
    - Arrange to introduce the Company's government-relations team to decision makers in the federal government;
    - Arrange media exposure as appropriate to advance efforts of the Company and its related entities;
    - Partner with Don Whyte and Christian Spilker, create a highly-strategic community outreach strategy to re-position the Company real estate initiatives in the County and the State. As requested, make in-person contacts with leaders, assess past perceptions and successes, begin to build a cohesive, complimentary, and consensus-based vision for the remaining Collier "legacy" real estate lands;
    - Provide strategy and creative in fulfilling new imaging and re-positioning of Collier Enterprisers endeavors as needed;
    - As requested, evaluate electronic messaging and branding for the Company and work with team to make sure there is complete and current alignment with objectives; and
    - Participate in generating political strategies to bring successful outcomes in mineral rights, Rural Lands West development, Everglades City acquisition.

3. Additional Scope of Work:
    - Day-to-day reporting to Don Whyte, Bob Corina, and Christian Spilker. Ultimate reporting for significant decisions will be to Miles C. Collier and Barron G. Collier II.

- Establishing a budget; expectations of what total Federal/State/Local political contributions will be.
    - **2020:** As established by the partners for 2020 election year: We have a working budget of $1,660,000 (which will be augmented by amounts for local and regional efforts) for political giving, to include:
        - **Presidential-level:**     $1,160,000
        - **Florida State-level:**     $500,000
        - **Local and Regional level:**     To be determined. 90-day assessment required to satisfy this figure.
- Anticipated/targeted outcomes for each of the above.
    - Assure the re-election of a favorable President and administration.
    - Bring to a successful close a bi-level government initiative to acquire Everglades City parcels.
    - As requested, create the relationships and consensus necessary at all levels of government to develop opportunities for Collier lands to become part of the President's Energy Independence initiatives, or equal satisfactory opportunity.
    - As requested, create a master plan and successful public-facing strategies which complement the Collier family's legacy in Southwestern Florida, and which successfully unite all initiates related to Rural Lands West, Everglades City, and Collier mineral rights.
    - Deepen Federal-level government and political relationships essential to CE real estate and business objectives. Continue to shepherd complimentary negotiations with The White House, Florida State Governor, Department of Interior, White House Political Office, and local officials and bring to successful conclusion.
- Spending authority; setting limits for when prior approval is required by CE executives, Don Whyte, family. Also, any related budget cost overruns.
    - Miles C. Collier and Barron G. Collier II will determine vision, budgets and direction of all spending and of all political and government engagement. Bob Corina, Christian Spilker, Don Whyte and Sonja Eddings Brown will create a pathway of accountability for all expenditures and reporting.
- Frequency and format of periodic reporting regarding future contributions and recipients, expected outcomes, application of funds and maintaining a running total/accounting of contributions/expenses.
    - Accountability for Sonja Eddings Brown will be demonstrated in weekly team conference calls for status and updates.
    - Monthly (or more frequent if requested) progress reports to Miles C. Collier and Barron G. Collier II and others as they may designate.
    - Communication, as requested, with owners and executives at Barron Collier Companies.

4. Term and Timing

Subject to Section 3 of the Agreement, the Term will commence on the Effective Date and is anticipated to run through 90 days following the Effective Date, and may be renewed for additional 90-day terms upon the written agreement of the parties.

All invoices will be submitted directly to the Company at 2550 Goodlette Road North, Suite 100, Naples, FL 34103.

**Exhibit B**

Consulting Fees will be billed at a rate of $15,000.00 per month.