**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| Sonja Eddings Brown, | Case No. 2:24-cv-00369-JLB-NPM |
| Plaintiff, | **UNREDACTED COMPLAINT** |
| v. | **FILED UNDER SEAL PURSUANT TO COURT'S MAY 1, 2024 TEXT ORDER (DOC. 10)** |
| Parker J. Collier, | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Sonja Eddings Brown ("**Plaintiff**" or "**Brown**"), by and through undersigned counsel, brings the above-captioned action against Defendant Parker J. Collier ("**Defendant**" or "**Parker**"), and alleges as follows:

### NATURE OF THE CASE

1.     For years, Plaintiff Sonja Brown, a veteran strategic communications and government relations expert, devoted her talents to furthering the wealth and interests of a prominent business and family in Southwest Florida: Collier Enterprises, Parker and Miles Collier, and Miles's brother, Barron Collier.  Brown's contributions to the Collier business enterprise have been vast and immensely successful, from leveraging her contacts to open up business opportunities for the sale of Collier land holdings to developing political action campaigns to organizing prominent charity events.

2.     But Brown's business relationship with the Colliers came to an abrupt halt when Parker Collier, the wife of the CEO of Collier Enterprises, a business

owner in her own right and an important Collier family member, engineered the abrupt termination of Brown.  After sending Brown out to promote the sale of Collier land holdings to the federal and state governments—while concealing material information from Brown that could have derailed these acquisitions and the Colliers' reputation—Parker began to view Brown as an existential threat. Brown began raising questions and concerns  about alleged malfeasance and corruption at Collier Enterprises regarding the very  land deals that would bring Parker and her family significant wealth, as well as the opportunity to sell their business empire outright to another entity, the Tarpon Blue Family of Companies ("Tarpon Blue").  Above all else, Parker was determined to ensure that these transactions succeeded so that she could enjoy the considerable financial benefits that would result from the sale of Collier Enterprises unencumbered by restrictions on her involvement in the Company that her brother-in-law, Barron Collier, had imposed.  Nothing, and no one, could stand in her way – certainly not Sonja Brown.  Concerned that the wrongdoing Brown was alleging could derail the agenda of Parker and her family, Parker tortiously interfered with Brown's business relationship and contract with Collier Enterprises, causing Brown significant damages and reputational harm.  Brown brings this action to rectify the harms caused by Parker's unlawful actions.

## PARTIES, JURISDICTION, AND VENUE

3.    Plaintiff Sonja Eddings Brown ("Brown") is an individual and resident of Utah.

2

4.     Defendant Parker Collier ("Parker Collier" or "Parker[1]") is an individual and resident of Florida.

5.     This Court has jurisdiction over the above-captioned action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), because she is a Florida resident and therefore subject to the jurisdiction of a court of general jurisdiction within the State of Florida.

7.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred within this District.

## FACTUAL BACKGROUND

### *Parker Collier and the Collier Family*

8.     For much of the 20th century, Barron Gift Collier and his family were the largest private landowners in Florida.  In fact, in 1923, the Florida Legislature named Collier County (the "**County**") after Barron.

9.     In 1976, Barron's grandchildren split up his company and grandsons Miles and Barron II Collier founded Collier Enterprises, Inc. ("**Collier**

---

[1] Because the members of the Collier family share a last name, they will be referred to by their first names to avoid confusion.

**Enterprises**" or "**Company**").  Throughout the years, the Company not only continued to own large swaths of land in Southwest Florida, but it also amassed a portfolio of real estate holdings and investments across the United States.

10.    Defendant Parker Collier is Miles Collier's wife, a business owner and an important figure in the Collier Family.  Upon information and belief, due to longstanding personal and professional conflicts between Parker and Barron II, Collier Enterprises has formally prohibited Parker from making decisions on the company's behalf or otherwise being involved in the company's business.  Upon information and belief, Parker has no ownership or equity interest in Collier Enterprises.

11.    This Complaint arises out of Parker Collier's interference in Plaintiff's business relationships with the Company.  Parker's wrongful interference has deprived Brown of valuable economic and professional benefits from a contractual and business relationship between her and Collier Enterprises.

12.    Upon information and belief, and as discussed herein, Parker was eager for her husband and Barron to sell Collier Enterprises and liquidate its assets.  That is because she was frozen out of managing Collier Enterprise's day-to-day affairs, and the only way to use freely the substantial capital that Miles Collier had tied up in Collier Enterprises was to sell Collier Enterprises and to distribute the liquidated assets to the ultimate beneficiaries, including Parker and Miles Collier's family.

13.     From 2017 until late 2022 when Tarpon Blue acquired Collier Enterprises, the Colliers aggressively sought to secure the company's sale.

14.     Selling the Company was a two-step plan.

15.     First, the Colliers sought to sell an 8,000-acre land parcel located in the Everglades in Southwest Florida (the "**Everglades Parcel**") to a government buyer.  Decades ago, the property had been contaminated following a chemical explosion.   Upon information and belief, the Colliers' offloading of the contaminated property would make the remaining company more saleable.

16.     The Colliers also worked to secure government approval to develop some of their land in eastern Collier County into "villages" that would house thousands of residential and mixed-use developments.  Rivergrass, the largest of such developments, would cover over 1,000 acres of land.   Once approved, Rivergrass would represent the crown jewel of the Collier's real estate assets, making liquidation ever more attractive and lucrative.  Upon information and belief, securing local government approval to develop this land would also make Collier Enterprises more attractive to buyers.

### *Sonja Brown*

17.     Brown is a veteran government relations specialist and strategic communications expert.  She began her career in media as a network producer for each of the major broadcast networks, and as an advertising writer and producer. Thereafter, Brown became a government and communications strategist for top brands, political campaigns, and family offices.

18.     Given her work ethic and penchant for fair and honest dealings, Brown had tremendous success for decades as a government relations and communications specialist, allowing her to develop an enviable network of personal and professional connections—including at the highest levels of federal and state government.

### *Parker Collier Interferes With Brown's Business Relations with Collier Enterprises*

19.     From 2016 until her termination in April 2020, Brown maintained a lucrative and successful business relationship with Collier Enterprises.  Building on her successful track record, Brown's responsibilities increased.  Beginning in 2019, Brown represented the Collier family's interests in, among other matters, high-level government meetings regarding some of its most significant interests, including to (1) broker the sale of the Everglades Parcel and (2) secure Collier County's approval to develop, among other things, Rivergrass.  Upon information and belief, these two deals would substantially increase the market value of Collier Enterprises, allowing the Collier family to reap a greater windfall from a future sale of the business.

20.     Between July 2019 and February 2020, Brown continued to perform work for Collier Enterprises on the Everglades Parcel and the Rivergrass plan, pursuant to her pre-existing business relationship with the Company, but without all of the terms of their business relationship set forth in a written contract. Instead, in July 2019, Brown signed a preliminary one-page draft ("July 2019

Document") that was only ever intended as a placeholder in advance of an actual contract that would be consistent with Brown's true role within the company.  The document itself acknowledged that "discussions will continue" about further "incentive compensation fees" for Brown in connection with her work in respect of the land sale.  The document was signed by Robert E. Gipson, outside counsel who has done work repeatedly for the Collier family, on behalf of "Collier Affiliated Companies."  Throughout her employment, Brown received $15,000.00 per month, and she expected to receive additional compensation commensurate with her role and responsibilities, including a fee for brokering the sale of the Everglades Parcel and for her pivotal role in the Rivergrass plan and sale.

21.     By January 2020, Brown had been so successful in her role that she was given a formal title and promoted to Director of Government Relations at Collier Enterprises, where she ultimately was charged with managing all of the company's intergovernmental relations and steering its political giving. Furthermore, in March 2020, a month before Brown's termination, the company asked Brown to hold herself out as the "new face" of Collier Enterprises, alongside Interim CEO Don Whyte.

22.     Even after Brown and Collier Enterprises executed a contract on February 14, 2020, Brown undertook additional responsibilities that were not set forth in the February 14 Contract.  She did so pursuant to the preexisting business relationship she had with Collier Enterprises and the Collier family, and with the expectation that she would be paid an additional remuneration or success fee when

the sales of the Everglades Parcel and the Rivergrass project went through.  The customary success fee for a sale of land on the scale of the Everglades Parcel would be approximately 5-10% of the value of the sale.  The Everglades Parcel ultimately sold for approximately $29,500,000, which means that Brown's success fee would have been approximately $1.5–3 million.

23.    At the same time, Parker directed Brown to undertake additional responsibilities on her behalf and on her family's behalf, for which Brown was not compensated including overseeing a number of Parker's personal and professional activities.  Brown reasonably expected to be compensated for an expansive suite of additional duties but was not.

24.    Parker knew about the existence of the business relationship between Brown and Collier Enterprises, by virtue of her longstanding personal and professional relationship with Brown and because of her marriage to Miles Collier, who then co-owned Collier Enterprises with his brother, Barron Collier II.  In fact, Parker helped Brown to establish a business relationship with Collier Enterprises such that Brown could represent its interests in a June 2019 meeting with President Trump and Governor DeSantis.

25.    Even though Parker initially facilitated Brown's introduction to Collier Enterprises, Parker turned against Brown when Brown threatened to expose misconduct and malfeasance within Collier Enterprises with respect to the Everglades Parcel and Rivergrass.

26.     As to the Everglades Parcel, no one at Collier Enterprises made any mention of the dark underbelly of the property, which Brown would later raise concerns about: the Everglades Parcel had long been contaminated.  To the contrary, Parker and her family intentionally sent Brown out to promote the Parcel while concealing material information about the contamination from her.

27.     There had been previous litigation concerning the presence of contaminants in the Everglades Parcel but, on information and belief, the contaminants had never been adequately cleaned up.

28.     Further, during her business relationship with Collier Enterprises, Brown reported former CEO Don Huffner's misconduct and malfeasance to secure the Everglades Parcel sale and Collier County's approval of the Rivergrass plan. Upon information and belief, Huffner's misconduct included inappropriate gifts and *quid pro quo* solicitations made to state and local government officials, each of which Brown reported contemporaneously.  After being dispatched to conduct an internal investigation into Huffner's activities, Brown learned of allegations that Huffner had engaged in financial misconduct.  Although Collier Enterprises represented to Brown in February 2020 that it had suspended—and then fired— Huffner, Brown learned and reported that he continued to do work for the company. Once again, Parker and her family allowed Brown to risk her own reputation by disseminating misinformation to important individuals and officials, while knowing that the information they provided her to share was materially false.

29.     Brown also learned of malfeasance related to donations to elected officials.

30.     Brown diligently engaged in efforts to protect Collier Enterprises' business and legal interests, by seeking to ensure that the company's executives did not engage in conduct that ran afoul of federal, state, and local laws and regulations.

31.     However, Parker perceived these efforts as detrimental to reaching her ultimate goal: to achieve the most lucrative sale of Collier Enterprises, which would enrich Parker and her family.

32.     Therefore, shortly after Brown discovered and reported that Huffner had continued to do work for the Company despite being fired, Parker intentionally and unjustifiably interfered with Brown and Collier Enterprises' business relationship by directing the termination of Brown.  Parker did so even though she was supposed to have no involvement in the operations of Collier Enterprises, has long been barred from making any decisions regarding or otherwise involving herself in Collier Enterprises' business, and even though she had no direct ownership or economic stake in Collier Enterprises.

33.     Yet, throughout the years and on this occasion, Parker did involve herself in the company's business.  Given Parker's marriage to Collier Enterprises' co-owner, and her repeated involvement in Company affairs, Parker succeeded in engineering the termination of Brown.

34.    Parker Collier's interference in Brown and Collier Enterprises' business relationship was done in bad faith and with malice.  Upon information and belief, Parker feared that if Huffner's malfeasance came to light as a result of Brown's complaints, it could jeopardize the approval of the Rivergrass project and the sale of the Everglades Parcel, among others, and ultimately, the value of Collier Enterprises to a potential buyer.

35.    Parker knew that she did not have the formal authority to involve herself in Collier Enterprises' business—and yet she did so anyway,  by directing the termination of  Brown.  Parker knew that she could succeed in getting Brown fired given her stature and marriage to Miles Collier.

36.    Given Parker's intentional, malicious, and unjustified interference in Brown's employment relationship with Collier Enterprises, Brown has suffered loss of income, business opportunity, and good will, as well as emotional distress and reputational harm.

37.    In addition to these losses, the Collier family and the agents of Collier Enterprises  repeatedly assured Brown that she would be granted incentive compensation in return for leading the effort to secure  the sale of the Everglades Parcel.  The July 2019 Document acknowledged that Brown and the Collier entities or persons were discussing "[p]otential incentive compensation fees[.]"  The same document acknowledged that Brown and the Collier entities or persons "anticipate those discussions [about incentive compensation] will continue."  When the CEO of the Collier Family Office later presented Brown with a February 2020 contract,

and demanded that she sign it immediately, he told Brown on February 14, 2020, that the agreement was merely a "placeholder for ongoing negotiations."

38.     Parker Collier has benefitted significantly from her egregious, intentional, malicious, and unjustified interference with Brown's business relationship.  Parker's actions have protected her and her family's reputation from the damage that would have been inflicted, had Huffner's misconduct come to light.  Moreover, Parker's furthered Collier Enterprises' efforts to conceal the contamination of the Everglades Parcel, to obtain the Rivergrass plan's approval, and facilitated Collier Enterprises' ultimate sale to Tarpon Blue (which was premised in part on the sale of the Parcel and the approval of the company's development plans).

39.     Notably, the sale of Collier Enterprises has netted Parker significant personal benefits—entirely separate from those that accrued to the company. Before the sale, Parker's brother-in-law, Barron II, had precluded Parker from any involvement in the Company's business.  The sale of the company was, therefore, more than merely a financial boon to Parker.  It not only enriched the Company in which her husband held a direct economic stake; upon information and belief, it also transformed her husband's interest in that Company into assets over which Parker could exercise direct control, freeing them from Barron II's restrictions.

40.     Parker should not be permitted to retain these ill-gotten gains, obtained as a direct and proximate result of her tortious conduct against Brown.

41.   Had Parker not unjustifiably interfered with Brown's business relationship with Collier Enterprises, the relationship would have continued given the significant responsibilities and recognition Collier Enterprises had given to Brown.   Brown would have received additional benefits and compensation pursuant to this business relationship.

### *Parker Collier Interferes With Brown's Contract with Collier Enterprises*

42.   On February 14, 2020, Brown executed a contract with Collier Enterprises.   Brown had substantial responsibilities under the February 14 Contract, including to: continue advancing and facilitating land sales; building Collier Enterprises' relationships with federal, state, and local decisionmakers; creating a political action committee and steering the company's political giving; developing public-relations strategies; and establishing budgets.   Collier Enterprises agreed to pay Brown a salary of $15,000.00 per month.

43.   Even though Parker initially facilitated Brown's introduction to Collier Enterprises, Parker turned against Brown when Brown threatened to expose misconduct and malfeasance within Collier Enterprises with respect to the Everglades Parcel and Rivergrass, as outlined in the paragraphs above.

44.   Parker knew about the existence of the February 14, 2020 contract between Brown and Collier Enterprises.

45.   Shortly after Brown reported that Huffner had continued to do work for the company despite being fired, Parker intentionally—and unjustifiably—

13

interfered with the February 14, 2020 Contract between Brown and Collier Enterprises by directing that Brown be terminated, as alleged above.

46.    Parker's interference in the February 14, 2020 Contract between Brown and Collier Enterprises was done in bad faith and with malice, as alleged above.  Upon information and belief, Parker feared that if Huffner's malfeasance came to light as a result of Brown's complaints, it could jeopardize the approval of the Rivergrass project and others, and ultimately, the potential to sell Collier Enterprises and liquidate the Collier family's wealth.

47.    Given Parker's intentional, malicious, and unjustified interference in Brown's contract with Collier Enterprises, Brown has suffered loss of income, business opportunity, and good will, as well as emotional distress and reputational harm.

48.    In addition to these losses, Brown was not paid the success fee or commission regularly awarded to Collier Enterprises employees for equivalent work.

49.    Moreover, Parker has benefitted significantly from her egregious, intentional, malicious, and unjustified interference with Brown and Collier Enterprises' contract, as outlined above.

50.    Had Parker not unjustifiably interfered with the February 14, 2020 Contract between Brown and Collier Enterprises, the contract would not have been terminated.  Brown would have continued to perform under the contract and be paid pursuant to it.

****

## FIRST CLAIM FOR RELIEF
## Tortious Interference with a Business Relationship
## Against Defendant Parker Collier

51.   Brown repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

52.   Plaintiff Sonja Eddings Brown maintained a business relationship with Collier Enterprises, absent a contract, that afforded Brown legal and contractual rights.

53.   Defendant Parker Collier knew about the existence of the business relationship between Brown and Collier Enterprises.

54.   Parker intentionally and unjustifiably interfered with Brown and Collier Enterprises' business relationship.

55.   Parker's interference with Brown and Collier Enterprises' business relationship was done in bad faith and with malice.

56.   As a result of Parker's interference, Brown suffered damages— including loss of income, business opportunity, and goodwill, as well as emotional distress and reputational harm.

**SECOND CLAIM FOR RELIEF**
**Tortious Interference with a Contract**
**Against Defendant Parker Collier**

57.     Brown repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

58.     Plaintiff Sonja Eddings Brown executed a contract with Collier Enterprises.

59.     Defendant Parker Collier knew about the existence of the contract between Brown and Collier Enterprises.

60.     Parker intentionally and unjustifiably interfered with Brown and Collier Enterprises' contract.

61.     Parker's interference with Brown and Collier Enterprises' contract was done in bad faith and with malice.

62.     As a result of Parker's interference, Brown suffered damages—including loss of income, business opportunity, and goodwill, as well as emotional distress and reputational harm.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**Against Defendant Parker Collier**

63.     Brown repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

64.     Brown conferred a benefit on Parker by undertaking various projects, as directed by Parker, to advance Parker's personal and business interests.

65.     Parker took advantage of her personal relationship with Brown to direct Brown to execute these projects on her behalf without additional compensation.  At all relevant times, the responsibilities and obligations taken on by Brown, as directed by Parker, were not within the scope of her employment duties or any other agreement between Brown and Parker or between Brown and an entity affiliated with the Collier family.

66.     Such work performed by Brown includes, but is not limited to:

<blockquote>

a.  Managing certain philanthropic and community relationships on behalf of Parker, including liaising with stakeholders, securing outreach opportunities, and representing Parker at board events.  While attending events on Parker's behalf, Brown created relationships and secured business for Parker's business endeavors.

b.  Facilitating the sale of Parker's collector Lamborghini.

c.  Performing various projects for Parker including consulting and training numerous personnel who worked for Parker.

d.  Coordinating the Collier family's personal political giving (separate from Collier Enterprises).

e.  Communicating on Parker's behalf with potential business partners.

</blockquote>

    f.  Assisting with business opportunities for Parker's family members, including evaluating an athletic contract for Parker's daughter and developing a website for Miles Collier's book.

    g.  Creating a "National Security Salon" to be held at Parker's ranch comprised of attendees from Brown's network.

    h.  Consulting on a marketing strategy for products produced at the Collier Vermont Farm.

67.    Parker directed and/or encouraged Brown to take on these projects because she knew Brown would advance her interests successfully.

68.    Indeed, Brown executed these projects successfully, conferring benefits on Parker.  Brown expected to be compensated for this additional work but was not.

69.    Parker accepted and retained the benefit of Brown's services.

70.    It would be unjust to allow Parker to retain the benefit of Brown's services without due compensation to Brown.

**FOURTH CLAIM FOR RELIEF**
**Quantum Meruit**
**Against Defendant Parker Collier**

71.    Brown repeats and realleges paragraphs 1 through 50 as if fully set forth herein.

72.     Brown conferred a benefit on Parker by undertaking various projects, as directed by Parker, to advance Parker's personal and business interests.

73.     Parker took advantage of her personal relationship with Brown to direct Brown to execute these projects on her behalf without additional compensation.  At all relevant times, the responsibilities and obligations taken on by Brown, as directed by Parker, were not within the scope of her employment duties or any other agreement between Brown and Parker or between Brown and an entity affiliated with the Collier family.

74.     Such work performed by Brown includes, but is not limited to the work set forth above in paragraph 64.

75.     Parker directed and/or encouraged Brown to take on these projects because Parker knew Brown would advance her interests successfully.

76.     Indeed, Brown executed these projects successfully, conferring additional benefit on Parker beyond the provision of Brown's services alone.

77.     On past occasions where Parker directed Brown to perform services on her behalf, Parker arranged for Brown to be compensated.  Accordingly, the circumstances made it such that it was reasonable to infer that these projects would be treated no differently, and Brown would be compensated fairly by Parker for her services.

78.     Parker accepted and retained the benefit of Brown's services.

79.     It would be unjust to allow Parker to retain the benefit of Brown's services without due compensation to Brown.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sonja Eddings Brown prays for judgment and relief against Defendant Parker Collier on each claim for relief in this Complaint, as follows:

      a. An award of compensatory damages as allowed by law and, as applicable, to be proven at trial;

      b. Punitive damages;

      c. Costs of this action and pre- and post-judgment interest, to the maximum extent provided by law; *and*

      d. Any other relief that this Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands a trial by jury of any issues so triable.

Dated: April 22, 2024          _/s/ Olga M. Vieira_____

**QUINN    EMANUEL    URQUHART    &
SULLIVAN LLP**

Olga M. Vieira (Fla. Bar No. 29783)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
Facsimile: (305) 901-2975
olgavieira@quinnemanuel.com

Crystal Nix-Hines (*pro hac vice* forthcoming)
Viola Trebicka (*pro hac vice* forthcoming)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
crystalnixhines@quinnemanuel.com
violatrebicka@quinnemanuel.com

Brendan Carroll (*pro hac vice* forthcoming)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
brendancarroll@quinnemanuel.com